I am informed all parties are here so we'll start with argument. Hearing first from the appellants. Mr. Calderon, you're arguing pro se? Yes. All right. So good afternoon. I'm Appellant Pablo Calderon and I reserve time for rebuttal. May it please the court. In this case the government has failed to prove the required materiality and harm elements of fraud. I will address the government's theory of materiality. The theory is wrong as a matter of law. The theory is not based on the language of the contracts, namely the letters of credit and the guarantees. The theory is not based on the law governing letters of credit. The theory relies exclusively on witness testimony. Their interpretation of the contracts and their understanding of the law. Key testimony is wrong on the law and falsely interprets the contracts. First, the bankers testified that had the banks known of changes made to the documents they would not have honored, even if admittedly the documents were facially complying. Second, Professor Byrne, the government's expert witness, testified that a copy of a bill of lading stamped copy non-negotiable does not comply with the condition of being a copy of an original. The bankers' understanding of the law is erroneous. And Professor Byrne's testimony is false as a matter of law. The bankers testified . . . And you argue to the contrary on which of these points that you just made. The first one is an erroneous interpretation of the law, and the second one is false as a matter of law. Do you mean that banks are required to accept facially compliant documents even if they are not originals, not original copies? Well, they have to . . . The testimony is, had the banks known of the changes, that's not sufficient. My point is that is not sufficient facts to be able to legally dishonor a presentation. If they'd known that the date had been changed, that would not have been enough? No. You want me to jump into the law? No, I'd like to know what kind of a system it is where you can change the date to become compliant and the bank still has to take the document. Okay. So sections 5108 and 5109 of the UCC state that the only ground for dishonoring a facially complying presentation is fraud in the underlying transaction. So there's no dispute here that the presentations were facially complying. No dispute. Although there was a change in the date, wasn't there, to make it compliant with the program? There was changes made to the documents, but they were facially complying. Whatever they were before, when they were presented, they were facially complying. Because the changed date then made it compliant. The changed date brought it into compliance with the program. What matters is the shipment. There's many different documents. For example, let's jump into the dates, if you like. Isn't there one case where if the date hadn't been changed, it wouldn't have been eligible for the program because it didn't fall within the range? The October 5th was not in the range. October 6th was in the range. So the question is whether October 6th was a valid date of export for the shipment. So in terms of if we're looking at the date of export, the question is that our point is that the definition in the regulations, this is something, this is not LC law. This is a requirement of CCC. It's the language of the regulations that has to be analyzed. We say that there's an ambiguity in the definition of date of export. So the regulations, 149320D, defines the date of export of a shipment is the onboard date of an ocean bill of lading. But we say that that's ambiguous. For example, a bill of lading may have two onboard dates on it. For example, in my brief, in page 36, I give the example of REF LIRA, bill of lading number 5. It had two onboard dates, October 7th and October 23rd. The issue date of the bill of lading, October 23rd, is an onboard date of the shipment. The shipment is onboard for weeks. Every single one of those days is... The whole time that the shipment is on the boat, that's onboard dates? Yes. But it doesn't say dates. It says onboard date, singular. Onboard date. But that's where the ambiguity lies. Any of those dates is an onboard date. If it said onboard dates, you might have a better argument. But when it says onboard date, that sounds like a specific date. So which one is it? Well, I... That's the whole point. It's ambiguous. So it doesn't say, of all those possible... Each one of those days is an onboard date. Which is the onboard date? And I'll give you an example. For example, the REF LIRA BLs, they were issued... That's on my brief, page 36, which I discuss it. They were issued at the port of discharge. Right? So... But most likely, those were the second set of bills of ladings. Because bills of ladings would also have been issued at the port of loading. So you have the same one shipment, two different... Potentially two different BLs with two different issue dates. Either of those dates is a valid date of export. Okay. Well, this is... Isn't this part of the course of business? Yes. Course of dealing. It's course of dealing. Right. So as course of dealing... So, Mr. Calderon, your time has expired. But you have served some time for rebuttal. And I will give you enough time to adequately present your rebuttal. Let's hear from counsel for Lillimo. Thank you, Your Honor. It's David Frederick from Mr. Lillimo. May it please the Court. The district court erroneously upheld the convictions based on the discrepancies in the bills of lading. That conclusion is unsustainable. The U.S. banks entered into loans with the Russian bank that assumed there would be discrepancies in the documents. How do you know? The letters of credit say so. If you look at joint appendix, page 1852, there is an against discrepancies but without affecting CCC requirements. That is in every single letter of credit. What does that mean, actually? What it... Can you explain that? Yes. What it means is that letters of credit are payment mechanisms that are designed to protect banks. And the underlying transport documents are designed to ensure that there is actual goods. Here, there was no dispute there were actual goods. There were real chickens on real ships that went to real Russian importers. And the only question is whether or not there are discrepancies in the underlying transport documents. The way the UCP is worded, it is designed to protect banks in the event that there are discrepancies in these transport documents. How do we know? On joint appendix, page 89, the authors of the UCP explain that the recent changes to the UCP are because 70% of documents prior to that time had discrepancies and were creating problems in the letters of credit. And so the design of the UCP to protect banks meant that if the banks did not know that there were discrepancies in the underlying transport documents, they were to be protected. What kind of discrepancies? I'm sorry. Was it a CCC requirement that there be a copy of the original bill of lading? A copy of an original, yes. A copy of an original, though, is exactly what was provided. The copy of an original bill of lading... Just making sure I understand the theory first. CCC requirements, no discrepancies as to those. They had to be strictly complied with? Not necessarily, because regulation 7 CFR 1493.120E says, yes, 7 CFR 1493.120E says that if the U.S. guarantee will not be legally threatened by, quote, any action, omission, or statement by the exporter of which the ASSANY bank, I put bank in brackets, had no knowledge. So if the banks don't have knowledge that there are discrepancies in these documents... They take it in good faith. They take it in good faith, and they are given their guarantee, and they are protected. And so as a result of that, these banks got everything they bargained for. They knew they were going to a USDA-approved Russian bank on terms that these banks accepted with documents that they knew had a probability that there would be discrepancies as to them. And so under Binday, under Novak, and under retail stores, because they got the benefit of their bargain, there was no contemplation of harm by these defendants as to the banks. Now at the very least, you have to reverse the restitution argument as well, because the restitution rested entirely on the theory that somehow the defendants increased the probability of the Russian default. But there was no evidence of that. These... You're talking about proximate cause. That's correct. There is no evidence that when these discrepancies in these transport documents occurred, that that did anything to increase the risk that this Russian bank was going to default. Is the argument... Is your argument that it has to be within the zone of risk? It has to relate to the risk of default of the Russian bank? I mean, it was clearly foreseeable, and if you could get the money from the bank by making false statements to the bank, you've clearly got but-for causation. I'm having difficulty seeing why you don't also have proximate cause. Because the standard under the Marino case is whether or not the zone of risk has to be concealed by the misrepresentations and omissions alleged. In other words, the zone of risk is risk of a Russian bank default, tie it to the omissions and misrepresentations, alterations in the bills of lading. They have no connection. And temporarily, these transport document discrepancies arose two years before the Russian bank defaulted. The Russian bank had paid off almost half of the loan when it defaulted. And what the government has sought to do here in overreaching in this prosecution, I would submit, is to blame the defendants by looking at these discrepancies in these documents and saying that they somehow should be responsible for the Russian bank defaulting when there was no evidence that these transport documents conveyed anything about the risks of this Russian bank default. And Judge Lidingston, the record also made clear that there were $135 million sum of loans that were tied up in this Russian bank default for which the defendants had no responsibility or tie whatsoever. And so if proximate cause means anything, and the statute says direct cause, there has to be a linkage between the misrepresentations underlying the commission of offense and the restitution order for the victim. And here there is none. But the USDA paid out their money on the guarantee, didn't they? That's correct. And here, again, the district court decided the case on a hypothetical. The hypothetical was assume that the banks would have risk about the default, that they couldn't have done it under that regulation that I just cited, the 1493.120e regulation. The government only references that regulation in one place in its brief, in a footnote on page 48. And there it gives the wrong standard for what should be applied here. They prosecuted this case on the theory that the banks had no knowledge. They can't then turn around and say that there's somehow some greater risk that the banks are not going to get the benefit of the doubt. And so what you have here is a situation in which both the benefit of the bargain problem with the prosecution and the restitution problem with the sentencing are completely diverged from how the rules are supposed to work. Now, if you'd like me to address materiality, I would be happy to do so. Would you do it now? Yes. Your questions, Judge Pooler, with respect to the date change, they do go to the discrepancies. There was, but let me make this one point, which is that if you don't agree with us about that, you still have to reverse the restitution. Because the restitution award was based solely on the stamps, putting an original . . . So you're not arguing about the forfeiture, only the restitution? Correct. And the restitution is based on our statutory interpretation of the definition of victim. So as to the date change, if you were to disagree with us about that, you still would have to reverse four of the substantive counts. The only count that would be left would be the conspiracy count, because the other four substantive counts all rested on the Cool Express transaction, which was putting the original stamp on. There were no date changes on the Cool Express transaction, and you would have to reverse the restitution award. And that is acceptable course of dealing, to put an original stamp on a document that is not obviously original? Well, it's a copy of an original. And that was . . . Sounds like an oxymoron to me. You know, it is, Your Honor. But the point is that the only original bills of lading that matter in the transport world are the ones that go with the goods. Those are documents of title, and you need to have an original ink signature on those in order to convey title to the goods. That's not what we're talking about here. We're talking about a copy that under the UCP Article 14 serves the function of a transport document. In other words, it proves there were real chickens on real ships that got to the real places. And so this is not a case where there were no ships or there were no goods. This is a series of clerical errors that Mr. Lilimo testified, and this is at page 1090 of the Joint Appendix, that the document examiner at Cobank liked to have the documents in a certain way, and he was trying to facilitate the transaction in order to do just that. The requirements did require a copy of an original, not a copy of a non-negotiable copy. Okay, so let's unpack exactly what that is, Judge Livingston, as a sort of practical term. When you get a bill of lading, it's usually done in triplicate. Those of us, the old-timers, remember that there's like a white copy and a pink copy and a yellow copy, and if you press really hard, it may— They're all originals. No. The top one is the original. The bottom one is a non-negotiable copy. And so what you have for these transport documents is this copy of original, as the UCP explains, is a copy that serves the function of an original. So the non-negotiable thing was something where the document examiners, in order to allay their confusion, made these—these changes were made to the copy. But that did not affect the ability of the bank to obtain payment because the letter of credit rules under the UCP, Article 14 expressly say that. But it might have increased the risk that the CCC would honor a guarantee if needed. No, because then the regulation says if the banks don't know, they're protected. Right. Assuming that the banks are able to persuade the CCC, they acted in good faith. These rules are all designed to protect the banks, and that's why the bank isn't a victim here because the bank got protected under both the UCP rules and under the CCC rules. The banks didn't lose any money. The banks didn't lose any—the banks made money on these transactions. The USDA lost money. The USDA— They were named as the victim on the restitution. And that's why you have to look at—there is no charged conduct that these defendants affected the risk of a Russian bank default one jot. One jot. Nothing. There's no evidence. And they couldn't have because the USDA had approved the Russian bank. Cobank had approved the Russian bank. Cobank had negotiated the terms of the loan. All of this economic interaction had occurred before the documents were even created or stamped or altered with respect to the transportation of these goods. The USDA charged rates that ensured that it was going to break even. It expected that there would be defaults. And when the world economic crisis of 2007 to 2010 occurred, there were many banks that defaulted and that affected the USDA. But you can't put these men in prison by virtue of these changes in these documents where you have a Russian bank that everybody knew was going to be a risky venture. And, in fact, when it defaulted, there was nothing and no representations that these defendants had anything to do with that. All right. This is where we'll stop. You also reserved some time for rebuttal. We'll hear from the government. Good afternoon, Your Honors. My name is Mike McGarry. I'm an assistant U.S. attorney from the District of Connecticut. On behalf of the United States of America, I was counsel below and with me at counsel table today is Assistant United States Attorney John Pierpont, who was also on the trial team below. U.S. Attorney John Durham, who also tried the case, is not able to come today but sends his regards. This is a case where the defendants altered documents, changed dates, removed watermarks, removed legends that said certified copy non-negotiable, stamped them original to cause the banks to release money that the banks otherwise would not have released, to put millions of dollars at risk that they otherwise would not have released. Counsel, do you concede that the only money lost was because this bank failed? No. I don't agree with that version of the facts. The bank failed, yes, but the defendants through their scheme put millions of more dollars at risk than otherwise would have been at risk. That risk didn't mature into a loss in most cases, isn't that correct? Well, again, having reviewed the published decisions of this court, the risk is increased dramatically. For instance, you talked about the changing of dates. When they change the date, they had millions of dollars at risk that the USDA may not have guaranteed and regardless of what counsel argues, maybe couldn't have guaranteed because as we know from the recent government shutdown, when money is allocated for a specific program at a specific period of time, the government can't just decide, oh, we're going to reallocate it outside that time frame. So if the shipment is October 5th and if there had not been money allocated left for an October 5th shipment, just because they changed the date to October 6th doesn't bring it into the program and it doesn't mean that the USDA necessarily had to or could take money from the 6th forward and necessarily use it on the 5th. Now that particular transaction that we talked about, we talked about with the USDA rep Mr. Doster, we talked about with the bank rep was the Ancash Queen and the Ref Lira. Those particular transactions didn't default, but the risk, the risk of loss was increased astronomically for that transaction because, in fact, it may well not have been covered. But we're supposed to look at the risk, not at the outcome. Well, I think when we look at, well, we don't want to necessarily be outcome determinative. I agree with that because the banks have to make, they're charged with making a discretionary economic decision. And when they make an economic decision, they, I think as this court has said, they have a right for accurate information to be in front of them. When they, and as the court has pointed out on a number of occasions, the statute, I believe it's 1349, I'm sorry, 1343.110 says that you have to have copy of a negotiable bill of original. And as we heard at trial, there are, from experts, there are different copies of bills of lading, there actually were blue, the ones from Maersk, and they say original on them. And they come in three copies and they can be for shipping documents, they can show, they can be a negotiable bill. And the CCC, under the regulations at the time, said we want the copies of the bills, copies of the originals. There are other copies that say non-negotiable. That's what the defendants altered and they changed because they couldn't get the originals that said original. There are circumstances in the law surrounding letters of credit where these non-negotiable copies can substitute for the original. And if this were one of those circumstances, wouldn't that create a materiality problem? Well, if I can answer the question this way, Your Honor, the letters of credit, specifically in paragraph 46A, calls for a copy of an original. Rudy Effing from Deutsche Bank testified that they wanted the originals to comply with the terms of the letter of credit. And he testified at Joint Appendix 418, and I'm going to quote him, but it's on page 418, when we say the documents are okay and the other banks say the documents are not okay, then we have a dispute. Obviously, we don't want to end up in that. Maybe, you know, we lose out if we made a mistake. So if the letter of credit here is calling for an original and Deutsche Bank or Co-Bank accept something else, they run the risk that the counterparty or the bank, the foreign bank, will show us your compliant presentation, and when they show it and say, well, wait a second, that's not what we called for, they might have a right to refuse that. Whether there are situations in letter of credit law not here to answer your question directly where you can substitute something else out, I can't speak to that, but I can tell you that the trial evidence from Mr. Effing from Deutsche Bank, from Ms. Holly Womack from Mr. Lillamo himself to other people at the time said, copy non-negotiable, we can't do it without a copy, with a copy non-negotiable. We need the original. He said that to, among other people, Mr. Jostarand, where he said, we can't do the deal. The bank is asking for a copy of the original. Can you get me a copy of the original? That's his own words at the time. And am I understanding the documentation correctly? The CCC required an original. The letter of credit said discrepancies are okay so long as they don't have anything to do with the CCC requirements, and that's in the letter of credit? I believe it does say discrepancies waived, provided they're not affecting CCC requirements, which I think, well, first of all, we took the position at trial, we argued at trial, and the jury agreed with us by virtue of the convictions that it was material, and that it's a question for the jury that it is material, and that we argued changing dates is not a discrepancy. Whiting out a watermark that says certified true copy is not a discrepancy. Whiting out certified true copy and stamping original is not a Shading issue? The shading issue, exactly. Haven't you waived that? No, we haven't, Your Honor, and I don't know why they put that in the brief, but if you look at page, I believe it's footnote 8 on page 18, we simply say there's another way that they altered documents. Actually, it's probably on page 13. The defendants also altered certain documents that had been whited out so that they would be less obvious that the documents had been altered. So we didn't waive that. What happened was they got these documents, we could call them bootleg documents, we could call them secondhand documents, but a big square was totally whited out, and as the woman from Maersk who testified, there's usually like a blue background, and if you white it out and then you make a photocopy of it, that part that's white is going to come out even brighter white while the rest of it kind of has a gray hue to it. So what one of the secretaries did was to shade it so it wasn't so obvious to the bank, and Mr. Calderon, who's here today, sent an email that says, you know, she said, I shaded it so it's not so obvious to the bank that it's been changed, and he said, good job. So clearly they have an intent to defraud the bank where they're saying, let's make it so it's not so obvious. Also, as far as intent, if these were not typographical, was it clerical errors? These were not clerical errors. These were intentional changes, intentional changes to get the banks to release millions of dollars, and when John Doster and this woman with the last name Wong did an audit, they went up to Mr. Calderon's house in Connecticut, which was also his office, and they were asking him about these bills of ladings because, as Mr. Doster had testified, they had some problems with the bills of lading, they had some questions. They didn't tell them anything about these changing the dates, the stamping of originals, the shading of the documents, which clearly if they were, if it was merely a clerical error, and this is an audit that went through the course of two days, they met them, they went to lunch, they went back to Mr. Calderon's home office, and then they met them the next day, and they never mentioned these changes. Would you take a minute while you're at the podium to discuss the proximate cause issue on the... Yes, Your Honor. As far as the topic of restitution, we think Judge Hall got it correct on restitution. The banks did lose money, the loss was passed on to the USDA, and the USDA guaranteed it. Was it the banks losing money, the failure of the Russian bank? I believe, as this Court has said in Paul, that as far as restitution goes, that there needs to be a necessary causal nexus between the offense and the losing of the money. I think this Court also said in Paul, if a victim's payments to the defendants were the mechanism through which the defendant profited from his conspiracy, and it is clear that no reasonable person or bank would have given the defendant her money if she had known the plan, then the district court must order restitution. But don't you agree that these defendants had nothing to do with the failure of the Russian bank? Well, I think that's beside the point, Your Honor, because I think as we saw from all the mortgage fraud cases, and I think if we look at Paul, what the defendant there argued was, well, he had the loan, the securities were inflated as collateral, and he had nothing to do with the collateral going down in value, but he still had made a fraudulent application for a loan. What about the language in Moreno that your adversary relies on? Is the risk that caused the loss within the zone of risk concealed by the misrepresentations? Clearly, the misrepresentations here didn't have anything to do with the risk of the bank defaulting. Well, again, I don't read Moreno as helping the defendant. I read Moreno as helping our argument in that Moreno is, the way I read it, is the Bayou Capital case where there's, I think, a $60 million Ponzi scheme. And then there's this other fellow, Mr. Moreno, who is the accountant who's doing the false books. And the court said, well, no, that was enough of a causal connection, because you did the false books, that if you had done truthful books, the Ponzi scheme would have been discovered. If that is sufficiently close, here, the false statements literally caused the bank to release the money. But it didn't cause the Russian bank to fail. It didn't, Your Honor. But once the money is put at risk, then that's where the loss happens. And I'm going to try to find the exact quote. I believe it might be the Shaw case from the Supreme Court where it says, you know, in a loan fraud, the loss happens when the money is put at risk. And if I could just give me a minute, Your Honor. It also explains that where cash is taken from a bank, but the bank is fully insured, the theft is complete when the cash is taken. So taking that from the Supreme Court in Shaw, the theft here is complete when Mr. Willemot and Calderon had the bank release the money. The fact that therefore, there is the economy, or the slowdown in 2008 caused the bank to fail. We don't know why the Russian bank failed. We know the Russian bank didn't pay the money back. Why- The question is, isn't the Russian bank failure exogenous to these transactions? Well, I think the, I would say no, Your Honor. Because the purpose of the whole program is to protect the banks in case the Russian banks fail. So that is reasonably foreseeable. It's so foreseeable that there's a program that if honest documents and if actual non-fraudulent loans are done, then the USDA is going to support it. So again, if we look at Marino as within, is it reasonably foreseeable? Is that something that is within the causal nexus? The Russian bank failing, that's clearly foreseeable. That's why there's the program in case these foreign banks don't come through. And I think also the Archer case also talks about that as well as to what the definition is with respect to being within the causal nexus. And if I just could have a minute. So in Archer, defendant was charged with conspiracy, I believe. Well, I don't want to struggle looking for the quote, but I think the Archer case helps us as well. And I guess what I would say, Your Honor, is when we look at the Roburs case, again, which is a Supreme Court case, and it specifically talks about the basic question that a proximate cause requiring, for instance, whether the harm alleged had a sufficiently close connection to the conduct at issue. Their existence, is it foreseeable? And the losses in part incurred through a decline in the value of collateral sold are directly related to an offender's having obtained collateral property through fraud. So here, the fact that the bank failed is directly foreseeable. And it is clearly, not only is it a close connection to the conduct, but it is the conduct. Their conduct caused the fraud. And again, if I know, I know I'm a little bit over time. It didn't cause the fraud, you claim, but their conduct did not cause the Russian bank to fail. Unless I'm misunderstanding the nexus. The Russian bank failed on its own, without any reference to these transactions. But we did not take the position that Mr. Calderon and Mr. Lillamo and these transactions caused the default of the Russian bank. Caused the Russian bank to default. But these transactions did not cause it. Correct, in matter of fact, the money from the US bank paid for by the USDA may well have propped up these Russian banks for a little longer period of time. But I think the interesting point that we made at trial to the jury, when we were arguing regarding materiality is, by virtue of the fact that they knew they could, under their scheme, use fraudulent documents. It allowed them to take a much more aggressive position, and it allowed them to get more guarantees and take more loans. Because unlike other people in this space, if they didn't have a shipment, they would just go out, buy the documents, and in these cases, fraudulently change the documents to make them comply. So therefore, we think we established and proved to the jury satisfaction, one of the aspects of the fraud was more money was put at risk than otherwise would have. That these are not clerical errors, but it allowed them to take out more loans from the US banks that then went over to the Russian banks. And again, I guess the last thing I would say is, Your Honor, if somebody lies on a student loan and then fails to pay it back, we don't say, well, the fact that they didn't pay it back, that's not what caused- That's a much closer connection than the connection here. Well, again, we don't know why that person didn't pay their student loan back. They maybe thought they were going to be a successful tennis player, so she took out a student loan for college, didn't go to college. But broke her ankle, couldn't play tennis, and now couldn't pay it back. We don't look and say, well, she couldn't foresee that she was going to twist her ankle and never play another pro game of tennis. She took out a student loan by lying, saying she was going to go to college, and never paid it back. We'd say, well, that's loan fraud. All right. So, thank you. Mr. McGarry, we'll hear first from Mr. Calderon, who reserved a couple of minutes. And then from Mr. Frederick. I'd like to bring your attention to the case, the law of the circuit. Recon Optical versus Government of Israel, an opinion by Judge Winter in 1987. And 3Com versus Banco do Brasil, an opinion by Judge Cabranes in 1999, which refers to the fraud exception of the independent principle for letters of credit. That is the law that governs letter of credit, the law in the Second Circuit. So, it's codified in sections 5108 and 5109 of the UCC. In New York State and Colorado State, the only ground for dishonoring a facially-compliant presentation is fraud in the transaction. That's what is explained in those cases that I cited. So, the only case for dishonor of a facially-compliant presentation is fraud in the transaction, which is fraud in the underlying transaction. The- Have you seen no chickens? What? By fraud in the underlying transaction, you mean there weren't really chickens? So, the underlying transaction must be examined and found to be fraudulent. Okay, so let's look at the underlying transaction, okay? The letter, there's three parties in the underlying transaction. The beneficiary, the LC beneficiary, LC applicant, and the CCC. The beneficiary and the applicant are, in effect, the same party. There's no fraud there. The only possible victim of fraud in the underlying transaction is USDA. So, to be able to dishonor, to be able to refuse to pay, the banks had to prove that there was fraud on the USDA. There's simply no showing of fraud on the USDA here. The factual basis for dishonor simply does not exist. So, the bankers are wrong. Had the banks learned of the alleged document changes, they would have honored, either voluntarily or by court order, because I would have sued them for wrongful disorder, and I would have won because they can't show that we defrauded the CCC. Now, in the case of the change stamps, there's no dispute that the shipments existed, that we acquired the rights to use the shipments in the program, and that they qualified for the guarantees. The government has to concede that for those cases, for the cases of change stamps, the guarantees were properly issued, and there was no fraud in obtaining, assigning, or claiming on the guarantees. Now, on the case of the change dates, there's a dispute, there's a genuine dispute, was October 6th a date of export, yes or no? So- But that issue was put to the jury, and they decided that there was fraud on the dates, didn't they? Well, the jury and the witnesses don't opine on the law, on the contract, unless the contract is ambiguous. So, we say now, in hindsight, the contract is ambiguous, and therefore, there's a genuine contractual dispute. And a contractual dispute does not rise to fraud in the transaction, whereby the beneficiary has no culpable right to expect honor. So, there was no grounds for the banks to refuse payment, because they would have never shown that there was outright fraud. They could have shown that there might be a dispute on the date of export, but that doesn't rise to fraud in the transaction. That doesn't rise to the standard of fraud in the transaction, in Judge Winter's 1987 opinion, and Judge Cabrera's 1999 opinion. Thank you. Mr. Frederick, you also have some time for rebuttal? Thank you, Your Honors. Let me start with the Novak case, because in that case, the court found materiality, but it did not find that the benefit of the bargain had been established. So, even if you don't agree with us about the changes to the documents, and you believe that it was a discretionary decision to release the money, you still have to reverse, because the banks got the benefit of their bargain. There was no contemplation of harm whatsoever here. Talking about reversing the entire, reversing the jury verdict? That's correct, because as a matter of law, the government does not dispute that the UCP applies. The letters of credit all incorporated the UCP, and as a matter of law, and the government says nothing about these sections of our brief that go meticulously through the articles of the UCP. That say that copies are allowed, that copies do not have to be exact and from the function, that banks knew- Why do we have to worry about, in a broad sense, the law surrounding letters of credit here, if the requirements of the program imposed a copy of original? Because then, the program isn't being complied with, and in the argument, the theory would be the bank is deprived of economic information going to its risk on the guarantee. Because the government didn't prosecute a fraud on the government theory. The government prosecuted a fraud on the bank theory. And under the regulation, the bank is protected. Mr. McGarry stood here and said, the rules are designed to protect the banks. And that's exactly what happened here. The banks were protected. Okay, so your response to that is the good faith, the obligation of the bank is entitled to, if it acted in good faith, to get the benefit of the guarantee. Absolutely, and that's why NOVAC controls this case. In NOVAC, the buyers got exactly what they had been promised, even though they were induced fraudulently through misrepresentations to enter into the transaction to begin with. Here, the banks got exactly what they bargained for. They knew that there was a Russian bank that was risky. Risk that they didn't bargain for, that's what the government says. But the risk was absolutely diametrically opposed to their theory of prosecution. If they had prosecuted the case on the theory that the banks could have known, or they ran some opportunity of non-compliance here that would have risked their guarantee, we would have a different case. He stood up here and told you that the rules are designed to protect the banks. They prosecuted the case on the theory the banks don't know about these alterations. And so they can't now say that in fact the banks risked something when their whole theory of prosecution was they couldn't have risked anything because they did not know about these alterations in the underlying transport documents. And that's why the banks got everything that they bargained for here. They knew they were entering into risky loans. They knew there was a risk of a Russian bank default. They knew that there could be discrepancies in the transport documents. They contracted to allow discrepancies in the documents. They incorporated international rules that allowed for the discrepancies in these transport documents. And for them to now say all of a sudden, and the district courts tried mightily to uphold the jury verdict here by coming up with a hypothetical that actually was 180 degrees the opposite of the government's prosecution theory. You simply cannot sustain the convictions on that basis. And restitution tries his mind today. He has no theory for how the banks were somehow cheated through these transport documents in a way that would have affected the risk of the default. Because there's no linkage whatsoever between what the alterations of these transport documents were and the risks of a Russian bank default. Judge Pooler, your questions and Judge Livingston, your questions completely expose the government here. So at the very least, you should reverse the convictions and you should reverse the restitution. Now on materiality, I think that it really comes down to the fact that the government has nothing to say about the UCP rules. And those UCP rules are designed to keep and prevent banks from doing the underlying fly specking of these bills of lading. Why? He gave you the answer. The rules are designed to protect the banks. And so long as the banks are operating in paper, not the underlying transaction, the international rules and the federal regulations are going to protect the banks. And as a result of that, none of these alterations made a witted difference to the underlying transaction because under Article 8 of the UCP, the banks must honor if the document appears to be facially complying. These documents all facially complied. The banks were required under the international rules to release the money. That's what they did. That's what they wanted to do because that's how they made more money. We ask that the convictions be reversed and the restitution reversed. Thank you. Thank you all. Very interesting case. We will reserve decision. I'll ask the clerk to adjourn court. The court is adjourned.